Estate of Alan M. Lincoln, Bankers Trust Company and Elizabeth H. Lincoln, as Executors of the Last Will and Testament of Alan M. Lincoln, Deceased v. Commissioner.
Estate of Lincoln v. Commissioner
Docket No. 107924.
United States Tax Court
1942 Tax Ct. Memo LEXIS 12; 1 T.C.M. (CCH) 326; T.C.M. (RIA) 42685; 12/24/1942. *12 George Craven, Esq., 20 Exchange Place, New York City, for the petitioner. Clay C. Holmes, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves a deficiency in estate taxes, determined by the Commissioner in the amount of $8,325.65. The issues not settled by stipulation, and therefore remaining for decision are: (1) Whether payments to the petitioners as executors, aggregating $21,874.13, comprise part of decedent's gross estate, or whether they constitute income of the estate; (2) Whether, if the payments are includible in gross estate, there should be allowed as a credit against state tax liability the sum of $1,959.36 paid by the petitioners as income taxes; (3) Whether $750, in cash and value of property set off by petitioners and delivered to the decedent's widow, should be allowed as a deduction from gross estate; (4) Whether $400, the amount of a pledge to a church made by decedent in his lifetime and paid by petitioners since his death, should be allowed as a deduction from gross estate; (5) Whether the proceeds of life insurance policies comprising the corpus of an inter vivos trust created by decedent *13 and includible in gross estate should be reduced, for estate tax purposes, by the amount of receiving commissions paid to the trustee; and (6) Whether $250, the face amount of a promissory note payable to and held by the decedent at the time of his death, should be included in gross estate. The parties have filed a stipulation of facts which we adopt and incorporate herein by reference. Such parts thereof as are necessary to an understanding of the issues are included in our findings of fact made from other evidence. Findings of Fact The petitioners are the executors of the will of Alan M. Lincoln, who died on December 7, 1937, a resident of Westchester County, New York. The estate tax return was filed with the collector of internal revenue for the fourteenth district of New York, on March 7, 1939. No election was made thereon to have valuation of the gross estate determined on the optional valuation date. For many years, first as a salesman and later as a partner, the decedent had been associated with the firm of Clarke & Company of New York City, dealers in paper. At the time of his death he and Henry T. Eaton were the sole members of the firm. Their principal source of income *14 derived from the sale of paper manufactured by Crocker-Burbank & Co. Association, of Fitchburg, Massachusetts, for which the partnership was the major sales representative. Up until about five years prior to decedent's death, Clarke & Company had merely purchased paper from the manufacturer and attempted to dispose of it at a higher price. A about that time, however, it was feared that the falling-off of business, as the result of a general economic depression, would make it unprofitable for the firm to continue operations in the manner theretofore followed. An oral agreement was entered into between Crocker-Burbank & Co. Association and Clark & Company by the terms of which the former agreed to pay to the latter whatever sums as would, together with its profits from other business, be sufficient to give it a fixed annual profit of $60,000. Profits from other business ordinarily ran from $7,000 to $8,000 a year and would not alone have been sufficient to meet expenses of the business. Although the agreement was no more than an informal understanding between the parties, terminable at the will of either, it remained in force at the time of death of the decedent. The partnership agreement *15 between decedent and Eaton entitled the former to a two-thirds and the latter to a one-third share of net profits. Articles Fifth and Sixth provided that a Reserve for Doubtful Accounts should be created by setting aside one-half of one per cent of gross sales, and that, in the event of death of a partner, the reserve should be maintained and continued until full payment for the interest of the deceased was made, and that his estate should share in such reserve in the same proportion that the deceased partner would have shared had he lived, and for the same period that his estate should be entitled to share in the profits of the business. Article Seventh of the agreement provided: Seventh: In the event of the death of either of the parties hereto, the surviving partner shall have a period of four months from the date of death within which to decide whether to continue or to liquidate the business, his decision in this regard to be evidenced in writing signed by him and delivered to the representative of the deceased partner. Should the surviving partner decide to liquidate the business, the business of the partnership shall be terminated upon the date of delivery of the aforesaid *16 writing signed by the surviving partner, and the surviving partner shall forthwith undertake the liquidation of the partnership as of that date, the interest of the deceased partner in the profits, and his right to interest upon his capital account to the date of such termination, and in the proceeds of liquidation, to be the same as though he were living, all such sums to be paid to his personal representative from time to time and as promptly as practicable and whenever funds are taken by the liquidating partner on account of his share. Should the surviving partner elect to continue the business, the firm assets, including the decedent's interest in the right to the use of the firm name and good will, shall without further action pass to and vest in the surviving partner who shall be deemed by the service of such notice of election to have assumed the firm debts and liabilities, and to have agreed to save the estate of the deceased partner harmless therefrom and thereupon by reason of the service of said notice of election and without further action, the surviving partner shall become obligated to pay to the personal representative of the deceased partner the sums due to said personal *17 representative for the interest of the deceased partner as follows: (a) The interest of such deceased partner in the partnership shall be ascertained and determined as of the close of business on the day preceding the death of the partner by stating an account (as of that day) in the usual manner then prevailing in the business, and the surviving partner shall pay the interest of such deceased partner in the partnership as so determined to the personal representative of the deceased partner, except that he may retain the capital account of the deceased partner for a certain period as hereinafter provided. (b) An amount equal to the full share of the net profits of the business as continued to which the deceased would have been entitled if living, pursuant to this agreement, during the remainder of the calendar year in which the partner died (except that if he dies subsequent to July 1st of any year, then his interest in the profits of the business shall continue from his death until six months from the first day of the calendar month next succeeding his death). The surviving partner may, in the event of his election to continue the business, retain in the business all or any part *18 of the capital of the deceased partner until the expiration of a period of two years from the date of death of the partner so dying; the surviving partner to pay interest upon all capital of the deceased partner so retained from the date of death of the deceased partner, at the rate of six per cent per annum, such interest to be paid quarterly to the representative of the deceased partner. Should the surviving partner decide to continue the business, as above provided, he shall owe the estate of the deceased partner no sums because of the decedent's interest in the good will and firm name other than as above set forth. Should the surviving partner decide to liquidate the business, then the personal representative of the deceased partner and the surviving partner shall be entitled to share equally in all sums which may be received because of the sale of the firm name and/or good will of the business. The partnership owned property, including tangible assets. For some years prior to decedent's death, Crocker-Burbank & Co. Association had been considering the advisability of taking over Clarke & Company into its own organization, or of setting up, in some other way, its own sales *19 agency. However, an intimate personal relationship existed between officials of the company and the members of the partnership, due, to a considerable extent, to the high regard of the former for the business ability of the decedent, and the partnership had been successful in postponing any definite action by the company. Upon Lincoln's death the issue arose again. Company representatives called upon Eaton and discussed with him the question of what steps might be taken. No decision was reached, however, until some time in July of 1938. The company then decided to organize a new corporation to be known as Crocker-Burbank Paper, Inc., to act as its sales repres ntative in the place of Clarke & Company. The purpose was accomplished, and, at the end of August 1938, Eaton entered the employ of the new corporation as vice president. In the meantime, Eaton had been faced with the necessity of making his election in accordance with the terms of Article Seventh of the partnership agreement. Because of the manufacturer's delay in deciding what steps it would take, he, toward the end of the four-month period allowed him, elected to continue the business of Clarke & Company, and served notice *20 to that effect on the petitioners on April 5, 1938. The share of net profits of the business to which Lincoln would have been entitled if he had lived, and to which petitioners were entitled under the terms of paragraph (b) of Article Seventh of the partnership agreement, amounted to $1,874.13 for the period from December 7 to December 31, 1938. That sum was paid to them by Eaton, in addition to interest on the value of the decedent's capital interest in the firm. On April 25, 1938, Eaton made the following written offer to the petitioners: I feel it would be to our mutual interest to provide for a new method of settlement of the partnership in order that our mutual rights and liabilities may be more speedily determined. For this reason, I make the following offer: 1. To pay over at once to yourselves as Executors the share of the net profits of Clarke & Company that the Lincoln Estate would, under the present agreement, be entitled to for the period, Dec. 7 - Dec. 31, 1937. 2. To pay over at once to yourselves as Executors the sum of $20,000 in full payment for any interest of the Lincoln Estate in and to the good will and firm name of Clarke & Company, and for release and surrender *21 (effective Jan. 1, 1938) of the right of the Estate to share in any net profits of Clarke & Company for the period Jan. 1 - June 30, 1938 as set forth in Sub. (b) of Article Seventh of the partnership agreement. 3. In further consideration of such payment of $20,000, the Estate shall also release and surrender any right it may have to any sums added subsequent to Jan. 1, 1938, to Reserve for Doubtful Accounts pursuant to the provisions of Article Sixth of the partnership agreement of Clarke & Company. The offer was accepted by the petitioners and the sum of $20,000 was accordingly paid. The $1,874.13 and $20,000 so paid by Eaton were treated by petitioners as current income of the estate, and were included in gross income on the fiduciary income tax return filed by them for the estate's first taxable period on the basis of a fiscal year ended May 31, 1938. The return was filed on the cash basis, and showed net undistributed income taxable to the estate in the amount of $20,408, and a tax due of $1,959.36, which was paid to the collector of internal revenue for the third district of New York, on July 11, 1938. If the two payments made by Eaton totaling $21,874.13 were excluded from *22 gross income, there would be no liability for income taxes. The petitioners, on April 18, 1941, filed a claim for refund of the income tax paid, but no part thereof has been refunded. The amount of Eaton's offer of April 25, 1938, was set at $20,000 because that figure was an approximation of the share of net profits of Clarke & Company for the six-month period from January 1, 1938, to July 1, 1938, to which the decedent, if he had survived, would have been entitled. It represented two-thirds of $30,000, which was the amount of net profit the partnership would normally expect to realize from a half-year's business. After the death of Lincoln, Crocker-Burbank & Co. Association continued to pay Clarke & Company on the basis of $60,000 a year. Although the transfer of any interest of the estate in and to the good will and firm name of Clarke & Company to Eaton was stated to be in further consideration for the payment of $20,000, the partners had not considered either good will of the business or the name of Clarke & Company as having any marketable value. Since the success of their business was dependent upon the arrangement with Crocker-Burbank & Co. Association, subject to termination *23 at the latter's will, they felt that neither good will nor firm name could have been sold for any price. No value was given either item on the firm's balance sheets. When Eaton entered the employ of Crocker-Burbank Paper, Inc., he undertook the liquidation of Clarke & Company. He sold the office furniture and the firm's inventory to the corporation, receiving in payment the value at which those assets were shown on Clarke & Company's balance sheet as of August 1, 1938. Firm name and good will were included in the bill of sale transferring the tangible assets. The business name was included to prevent its use by any other person. The sale price, which was approximately $8,000 or $9,000, amounted to the aggregate of the balance sheet values of the tangible assets transferred. In addition to the two payments aggregating $21,874.13, the petitioners also received from Eaton other payments in accordance with the terms of paragraph (a) of Article Seventh of the partnership agreement. These latter amounts have been included in the decedent's gross estate, and as to them there is no dispute. The respondent determined that the sum of $21,874.13 is includible in the decedent's gross estate *24 as the value of his interest in the firm name and good will of Clarke & Company. Pursuant to the provisions of section 200 of the Surrogate's Court Act of New York, the petitioners set off and delivered to Elizabeth H. Lincoln, the decedent's widow, the motor car and personal effects of the decedent having a value of $450, and the sum of $300 in cash. Respondent has determined that the property and cash, of the aggregate value of $750, should be included in gross estate, and that no deduction in respect thereof is allowable. During his lifetime the decedent made a pledge of $400 to Christ Episcopal Church, Rye, New York. It remained unpaid at his death, but petitioners have since paid it. The respondent has disallowed the deduction claimed in respect of the payment. The decedent, on October 14, 1927, created a trust of certain policies of insurance on his own life for the benefit of persons named in the trust instrument. He reserved full powers of alteration and revocation, but the trust remained in force at the time of his death. The proceeds of the policies, amounting to $139,052.27, were accordingly paid to Bankers Trust Co., the trustee. In accordance with the provisions of *25 Section 1548 of the Civil Practice Act of New York, receiving commissions in the amount of $1,400.52 were paid to the trustee on January 21, 1938. Respondent has determined that the full amount of the proceeds of the policies is includible in gross estate, without any reduction for the commissions so paid. Among the assets passing to the petitioners, as executors, was a promissory note, in the face amount of $250, made by Ralph French and payable to the decedent. On February 18, 1938, one of the officers of the corporate executor wrote to French requesting payment. The debtor advised the officer that he was then, and since the time of decedent's death had been, unable to make any payment on account of the note; that his income was small; that the mortgage on his home property was in such amount that it would yield no equity to a creditor; but that he would make a payment if his financial position improved. Payment was again requested on August 3, 1938, and again French represented that he was unable to pay. His statements were investigated through his employer. Petitioners concluded that they were true, and that no collection could be effected by legal action against the debtor. *26 French died February 21, 1939, leaving no assets. No payment on the note has ever been made. The petitioners assign as error the respondent's failure to exclude its face amount from the decedent's gross estate. Opinion This proceeding involves several unrelated questions. We consider them seriatim. 1. Does the sum of $21,874.13 paid to the executors of the estate of the deceased Alan M. Lincoln constitute a part of his gross estate, as determined by the Commissioner, or income accruing during the period of administration, as contended by the petitioners? The petitioners contend that under the partnership arrangement between the deceased and the surviving partner they have included in gross estate the value of the interest of the decedent in the partnership and that the $21,874.13 paid to the executors is a separate matter and was paid as income to the estate. At the date of the decedent's death, and under the partnership agreement, the estate, in case the surviving partner elected to continue the business, had the right to enforce against the surviving partner an obligation to pay "for the interest of the deceased partner as follows:" (a) to have the value of "the interest of such *27 deceased partner in the partnership" ascertained by stating an account as of the day preceding death and to be paid that amount; and (b) to receive a full share of the net profits of the business, if continued by the survivor, until June 30, 1938. This latter right included the right to an interest in the reserve for doubtful accounts. It is not clear from the record whether the amounts included in gross estate include the interest of the estate in the reserve for doubtful accounts, which the survivor had a right to have maintained. The survivor did continue the business and elected so to do; and paid to the estate certain monies. In our opinion the amounts so paid constitute a part of the gross estate. Under the recent decision in McClennen v. Commissioner, 131 Fed. (2d) 165, affirming George R. Nutter, 46 B.T.A. 35, the court rationalizes at length to the effect that although a partnership agreement provides that the estate of a deceased partner shall have certain period, such as the term of the partnership, to receive income, nevertheless the value, on the date of the death of the deceased, of the right to receive *28 income in the future, is an asset of the estate and should be included in gross estate and is not mere income of the estate during the process of administration. Cases involving no partnership capital, such as * Bull v. United States, 295 U.S. 247, are not applicable here, for the record plainly indicates that the partnership owned capital assets, as is shown by the petitioners' contention that the value of the decedent's interest therein has been included in gross estate, and Eaton received and sold tangible property. We have therefore only the narrow question as to whether, in addition to the admitted value of interest in the partnership, the right of the estate to share in profits after death is also to be included in such estate. Under the McClennen case, supra, the value of that right is a part of gross estate. Nothing indicates that the value of the right at death, if includible at all, was less than the amount paid. Moreover, the surviving partner designated the $20,000 paid by him to the estate of the decedent as: * * * in full payment for any interest of the Lincoln Estate in and to the good will and firm name of Clarke & Company, *29 and for release and surrender (effective Jan. 1, 1938) of the right of the Estate to share in any net profits of Clarke & Company for the period Jan. 1 - June 30, 1938, as set forth in Sub. (b) of Article Seventh of the partnership agreement. 3. In further consideration of such payment of $20,000, the Estate shall also release and surrender any right it may have to any sums added subsequent to Jan. 1, 1938, to Reserve for Doubtful Accounts pursuant to the provisions of Article Sixth of the partnership agreement of Clarke & Company. It is thus apparent that instead of merely paying income to the executors of the estate, the surviving partner provided for payment as well for the good will and firm name of Clarke & Company and for the surrender of monies, in amounts not shown by the record, in the reserve for doubtful accounts, in which the decedent's estate had an interest; and it is thus apparent that at that time at least the surviving partner did not consider that he completely paid for and obtained title to the interest of the decedent in the firm assets, good will and name by merely paying the amounts ascertained by stating an account as of the close of business the day preceding *30 the day of the decedent's death. Also, as above noted, the partnership agreement provides that not only the amount of the account stated, but an amount equal to the full share of the net profits of the business as continued, shall be paid to the personal representatives of the deceased "for the interest of the deceased partner." It is plain, then, that there is no clear line of cleavage between the payment of the partnership profits after the death of the decedent, and payment for and because of the decedent's interest in the partnership, as the petitioners contend. The principal argument is that the good will and firm name had no value, that it could not be sold. Nevertheless, we are not convinced that it was not of some value to the surviving partner to be able to elect to continue the business under the name of Clarke & Company. Indeed, he testified in substance that the reason he so elected was that he did not yet know the intentions of the Crocker-Burbank & Co. Association, which for several years Clarke & Company had been representing. It may well be that he was willing to pay the $20,000 rather than liquidate the business, because of the fact that he was thus enabled to secure *31 from Crocker-Burbank & Co. Association $30,000 for the period from January 1 to June 30, 1938, which he might not have received had he closed the doors of the business on January 1, 1938. It is apparent from the fact that Crocker-Burbank & Co. Association continued to pay on the basis of $60,000 per year, that it considered valuable the representation by Clarke & Company after Lincoln's death. The first item mentioned in the survivor's offer as consideration for the $20,000 is good will and firm name, and the partnership agreement contemplated value therefor, since it provided that in case of liquidation the estate and the survivor should share equally in any sums received "because of the sale of the firm name and/or good will of the business." To say the least, the surviving partner after his election to continue the business and thereby to become entitled to the firm name and good will - which specifically conveyed to him the right of the executors of the estate to share in the profits after January 1, 1938 - was able to deal with Crocker-Burbank & Co. Association which otherwise he might not have been able to do. He controlled name and good will, and passed control thereof to Crocker-Burbank *32 & Co. Association, for it was specifically included in the bill of sale, and it was desired that no one else use the firm name. It is clear that Eaton was careful to obtain the firm name and good will. We believe he considered them of value. Though the profits of the business, other than those from Crocker-Burbank & Co. Association, were only $7,000-$8,000 per year, not sufficient to meet the expenses of the business carried on, it is reasonably conceivable that some one else, willing to do business on a smaller scale with less expense, might have been willing to pay for an established name, and have made a profit on the $7,000-$8,000. We think the petitioners have failed to show that the firm name and good will were of no value, or that payment of the $21,874.13 in no degree was for the decedent's interest in the firm. We find no error on the part of the respondent on this point. 2. We next consider whether credit should be given against estate tax liability to the amount of $1,959.36 paid by the executors as income taxes, since the $21,874.13 has been included in gross estate. The petitioners cite Nichols v. United States, 64 Ct. Cl. 241; certiorari *33 denied, 227 U.S. 584, and other cases. The respondent does not brief the question and apparently does not contest the point. We hold that the credit should be allowed. 3. Was a deduction of $750 for widow's allowance properly disallowed by the Commissioner? The only facts on this point are stipulated, and are merely that the widow actually received $750, in cash and personal property, by way of statutory widow's allowance. The statute, section 303 (a) (1), Revenue Act of 1926, as amended by section 805, Revenue Act of 1932, and section 403 (a), Revenue Act of 1934, requires that such allowance be "reasonably required." No showing of such reasonable requirement having been made, we find no error in the disallowance of the deduction. 4. The Commissioner disallowed a deduction of $400 because of a pledge made to a church by the decedent during his lifetime and paid by the executors. On brief the petitioners agree that under Taft v. Commissioner, 304 U.S. 351, the pledge is not an allowable deduction, but suggest possible application of legislation which might be enacted by the Congress in the Revenue Act of 1942, and "wish *34 to preserve their right to such deduction in the event the statute is so amended before the Board's decision in the case becomes final." Though such Revenue Act has now been enacted, no suggestion is made that the provisions thereof affect the Taft case; we therefore find no error in the disallowance. 5. May the petitioners deduct from proceeds of life insurance policies placed in a revocable inter vivos trust created by the decedent, receiving commissions paid to the trustee? The receiving commissions were calculated under Section 1548 of the Civil Practice Act of New York, providing trustee's commissions for receiving trust principal, and were paid on January 21, 1938, about six weeks after the death of the decedent, and after the life insurance had been collected. The petitioner argues that the commissions were a charge against the insurance proceeds at the date of the death, the trustee had a right to collect when the proceeds were collected, and therefore the amount of the commissions should reduce the insurance proceeds entering into the gross estate. The respondent's position is, in short, that no duties had been performed by the trustee prior to the death so that *35 there was at that date no liability for commissions, therefore no reason for deduction of commissions from trust principal. Although several cases are cited by the petitioners, and the respondent cites Central Hanover Bank & Trust Co., 40 B.T.A. 1210 (reversed on another point), 118 Fed. (2d) 270, no case cited is of any material assistance here, except Estate of George S. Fiske, 45 B.T.A. 52 (quoted below), for the reason that none involves a situation parallel with the present, that is where the trust corpus consisted only of proceeds collected after the death upon insurance on the decedent's life. The commissions were collectible only upon collection of the life insurance proceeds, and we therefore face the question whether the gross estate, which of course is to be valued "at the time of * * * [decedent's] death * * *," should be considered diminished by the fact of collection after death commissions based upon insurance proceeds collected after death. Since the commissions had not yet been earned at the time of the death because they are based only upon the receiving of trust corpus, there is point *36 to the view that at the date of the death the estate included the entire insurance proceeds, as contended by the respondent. However, closer scrutiny of the question convinces us such view should not be approved. The gross estate is under the statute to be increased by the value at the time of the death. At that instant the insurance companies became liable to pay to the estate $139,052.27. But such amount does not necessarily represent the value of the right to receive it, for, as in this case, the collection of the full amount might necessarily be incumbered by expense, thus cutting down the value of the right to receive to the extent of such unavoidable expense. Here the state statute created a positive and inescapable expense, or charge in connection with the collection of the principal, and though it is true that the trustees had at the date of death not earned the commissions, we think that in arriving at the value of the right to receive the principal amount of the life insurance proceeds, at some future date, we may not disregard a charge which the state statute imposed upon the collection dates. The statutory provision is to be read into the contract of trusteeship over *37 the life insurance proceeds. In Estate of George S. Fiske, supra, we did not have the same situation as here, for there the trust was terminated at the instant of death under the terms of the will and the charge to which the trustee was entitled was a termination charge. Nevertheless, in upholding the deduction of the charge for trustee commissions from the gross estate, and denying the effect of a regulation, stating the trustee's commissions were not deductible, we said: * * * But it [regulation] does not apply to a charge, such as this, which had to be paid to free the trust property and let it pass as a part of the decedent's estate under the power exercised in his will. Such a charge is proper charge against the estate, allowed by the laws of Massachusetts, and deductible under section 303 (a) (1) of the Revenue Act of 1926 as amended. We think the same is here true, and that the principal amount of the life insurance proceeds collected after death may not be considered the value at the date of the right to collect. On this point we sustain the petitioner. 6. Finally, we consider whether a promissory note of $250, owing to the decedent, had *38 at the date of death any value includible in gross estate. The stipulated facts show that shortly after decedent's death an officer of the corporate executor wrote French, the maker of the note, requesting payment, that French came to see the officer and said that since prior to decedent's death his compensation in salary or commissions had been small and that it had during that time been impossible for him to pay anything on the note; that his home was so mortgaged that a creditor would have no equity; that French promised to pay, if his financial condition improved; that several months later he said it had not improved, and that he was unable to pay anything; that investigation caused French's statements to be considered true; and that he died on February 21, 1939, leaving no assets and nothing has been collected on the note. We think it clear that the note had no value at the decedent's death, and find error in the inclusion of the $250 in the gross estate. Decision will be entered under Rule 50.